Whitaker, Judge,
dissenting:
I regret that I am unable to agree with the opinion of the majority.
That opinion correctly says that “the time when a right to receive or a liability to pay an ascertainable amount becomes fixed * * * is decisive of the proper time for accrual” ; but I disagree with the statement that the amount of plaintiff’s profit was ascertainable in the fiscal year ending in 1945.
The contracting officer had agreed with plaintiff that its profit should be a certain percentage of the cost of the work done, but this was subject to approval by the Settlement Eeview Board. On review, the contracting officer’s superiors in Washington demanded an explanation of the difference between the estimated figure of work in process of 25 percent, on which the agreed percentage of profit had been based, and the actual figure of 7 percent. Most of the contracts provided for a profit, in the absence of an agreement, of 2 percent of the cost of materials purchased, but not in process, plus 8 percent of the cost of work in process. The profit agreed on between plaintiff and the contracting officer was based on the estimate that 25 percent of work was in process. It was not until after this variance between the estimate of work in process and the actual amount had been explained that the *668 Settlement Review Board approved the rate of profit tentatively agreed upon. This was on March 27, 1946, long after the close of the fiscal year ending in 1945.
It was impossible to ascertain the amount of plaintiff’s profit until the rate or percentage to be used in computing it was known.
The fact that the rate of profit was not determined prior to September 80, 1945, is an essential difference between this case and Continental Tie and Lumber Co., v. United States, 286 U.S. 290.
In Continental Tie only two factors had to be considered in determining the amount of the award: (1) income figures derived from the books of the plaintiff, and (2) the calculations required by section 204 of the Transportation Act of 1920, 41 Stat. 456, 460. Under that Act these two factors were fixed, with nothing left to be done except the ministerial act of computing the award. No action of either party could have varied these factors; hence, no action of either party could have varied the amount of the award. Not so in the present case. Although the cost figures might have been reasonably ascertainable from plaintiff’s books, there was no statutory formula nor an agreed percentage to apply to these figures. On the contrary, there was a variable profit percentage rate to be determined by negotiation and settlement between the parties, if possible. Therefore, unless a settlement had been reached, which was binding on the parties, or it was definitely determined that none could be reached, it cannot be said that the amount to which plaintiff was entitled was capable of being reasonably ascertained. The profit rate tentatively agreed upon could have been revised prior to September 30,1945, and, hence, the amount of the award was not 'known prior to that date. As pointed out above, this was not the case in Continental Tie; therefore, that case is not controlling.
In the opinion of the majority, it is stated that the tentative profit rate was not challenged. This is erroneous. In finding 35, it is said that at the January 8, 1946 meeting, the reasonableness of the 4.875 percent rate was questioned, because it had been predicated on an estimate of the percent *669 age of plaintiff’s inventory consisting of work in process which was at variance with the percentage shown in plaintiff’s settlement proposal. If plaintiff had been unable to explain the discrepancy, in all probability defendant would have found the 4.875 percent rate unreasonable, and would not have approved it.
For the reasons stated, I respectfully dissent.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Roald A. ITogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is and was a Delaware corporation, being the surviving corporation in a statutory merger of Food Machinery Corporation and Westvaco Chemical Corporation. Reference to plaintiff includes the predecessor Food Machinery Corporation. Plaintiff’s principal office is and was at San Jose, California.
2. The taxes involved in this case are corporate income and excess profits taxes paid by plaintiff to defendant for its fiscal year beginning October 1,1944, and ending September 30,1945. Its tax returns for this year were due on December 15, 1945, but plaintiff requested and was granted extensions of time and actually filed the returns on May 17, 1946, with the Collector of Internal Revenue for the First District of California. Plaintiff’s books of account are and were maintained on the accrual method of accounting, and its returns were prepared accordingly.
3. During the tax year ended September 30,1945, in addition to its other activities, plaintiff was engaged in the manufacture of amphibian tanks (Landing Vehicles Tracked) and spare parts under contracts with the Navy Department. Before plaintiff had completed performance, certain of its contracts were fully or partially terminated by action of the Navy. These uncompleted contracts so terminated, together with a description of the contract, the original amount of contract, the date of termination notice and the extent of termination, were as follows:

*670

Under the column “Extent of Termination”, the term “Partial” means that some deliveries had been made on the listed contracts prior to termination, whereas “Complete” means that no deliveries had been made and that termination canceled the entire contract.
Of the above-listed contracts, all except Nos. 2166, 23180, and 31131 contained the Uniform Termination Article. That article, as taken from contract No. 22512, provided (in the absence of an agreed termination settlement) :
(d) In the event of the failure of the Contractor and contracting officer to agree as provided in the paragraph (c) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this section, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (c), shall pay to the Contractor the following amounts:
(1) For completed articles delivered to and accepted by the Government (or sold or retained as provided in paragraph (b) (7) above) and not theretofore paid for, forthwith a sum equivalent to the aggregate price for such articles computed in accordance with the price or prices specified in the contract;
(2) In respect of the contract work terminated as permitted by this section, the total (without duplica *671 tion of any items) of (i) the cost of sncli work exclusive of any cost attributable to articles paid or to be paid for under paragraph (d) (1) hereof; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders as provided in paragraph (b) (5) above, exclusive of the amounts paid or payable on account of supplies or materials delivered or services furnished by the subcontractor prior to the effective date of the notice of termination of work under this contract which amounts shall be included in the cost on account of which payment is made under subdivision (i) above; and (iii) a sum equal to 2 percent of the part of the amount determined under subdivision (i) which represents the cost of articles or materials not processed by the Contractor, plus a sum equal to 8 percent of the remainder of such amount, but the aggregate of such sums shall not exceed 6 percent of the whole of the amount determined under subdivision (i), which for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings;
(3) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (b) (9) hereof; and any other reasonable cost incidental to termination of work under this contract, including expense incidental to the determination of the amount due to the Contractor as the result of the termination of work under this contract.
The total sum to be paid to the Contractor under subdivisions (1) and (2) of this paragraph (d) shall not exceed the total contract price reduced by the amount of payments otherwise made and by the contract price of work not terminated. Except for normal spoilage and to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraph (d) (1) and paragraph (d) (2) (i), all amounts allocable to or payable in respect of property which is destroyed, lost, stolen, or damaged so as to become undeliverable prior to the transfer of title to the Government or to a buyer pursuant to paragraph (b) (7) or prior to the sixtieth day after delivery to the Government of an inventory covering-such property, whichever shall first occur.
# ífí * ❖ *
(h) For the purposes of paragraphs (d) (2) and (d) (3) hereof, the amounts of the payments to be made by the Government to the Contractor shall be determined in accordance with the Statement of Principles *672 for Determination of Costs upon Termination of Government Fixed Price Supply Contracts approved by the Joint Contract Termination Board, December 31, 1943. The Contractor for a period of 3 years after final settlement under the contract shall make available to the Government at all reasonable times at the office of the Contractor all of its books, records, documents, and other evidence bearing on the costs and expenses of the Contractor under the contract and in respect of the termination of work thereunder.
4. All of the contracts listed in finding 3 were war contracts as defined by, and were terminated under, the provisions of the Contract Settlement Act of 1944, enacted July 1, 1944, 58 Stat. 649, 41 U.S.C. 101, and the Joint Termination Regulation, as amended, issued pursuant thereto by the War and Navy Departments, 9 F.R. 13316; 10 F.R. 10793, 13189; 11 F.R. 28, 1728, 4226, 6295, 11479.
5. During the pertinent period of time, plaintiff’s Procurement and Engineering Division, located in Los Angeles, was responsible for the administration of plaintiff’s war contracts. It was an engineering and administrative group which performed all the engineering functions, made practically all purchases and procurement, let out most subcontracts, scheduled all work, and approved all invoices for payment.
6. Prime manufacturing under plaintiff’s war contracts was carried on by plaintiff’s Anderson-Barngrover Division at San Jose, California, its Riverside Division at Riverside, California, and its Lakeland Division at Lakeland, Florida.
7. Plaintiff kept a full set of records with respect to cost and performance. These records indicated what material was purchased for each contract. However, because common items were involved, material involved in the performance of more than one contract was physically commingled and not segregated or earmarked for a particular contract. Common items for more than one contract were often purchased on a single purchase order.
8. With respect to work in process, only labor and burden and raw materials fabricated by plaintiff appeared in that account on plaintiff’s books. Purchased components and material were put directly in finished goods as items were *673 completed. Plaintiff also fumislied material to small subcontractors in the vicinity of its plants and paid them on an hourly rate for work thereon, all directions and specifications being supplied by plaintiff. Although strictly work in process, such material was not reflected in that account on plaintiff’s books.
9. As of any given date, no accurate determination of work in process could have been made from plaintiff’s books and records. Only a physical count would have disclosed the actual work in process on any particular date. No effort was ever made by plaintiff to ascertain the full extent of the amount of its work in process on the pertinent contracts.
10. Subcontracting was arranged by plaintiff’s Procurement and Engineering Division. Between 1,500 and 2,000 subcontractors and suppliers located throughout the United States were involved.
11. All plaintiff’s war contracts were with the Bureau of Ships, were reduced to writing, and were approved on behalf of the defendant in Washington, D.C. Commander Hezlep was the Supervisor of Shipbuilding located with plaintiff’s Procurement and Engineering Division in Los Angeles. He administered the contracts for the Navy Department, adjudicated change orders, and represented the Navy with respect to modifications.
12. Early in 1945 plaintiff became aware of the possibility of termination of its contracts and desired to develop an expeditious method of arriving at the costs resulting from cancellation.
13. Pretermination conferences were held at the Bureau of Ships in Washington on June 20 and 21 and during the week of July 2, 1945. Plaintiff was represented by Messrs. Davies, Carter, Pope, Hait and Cook; the Bureau of Ships by Captain Eosenstein, Lieutenant Commander Pettingill and Lieutenants Bassett, Leva and Yeager. Mr. Davies was plaintiff’s president, and Captain Eosenstein was the contracting officer of the Bureau of Ships charged with the responsibility for handling plaintiff’s contracts.
14. Subjects discussed at the pretermination conferences were the maimer of counting and classification, preservation and disposal of inventories, the rate of profit plaintiff would *674 receive, and the approximate amounts involved. With respect to the rate of profit, plaintiff proposed an overall rate of 6.4 percent, the rate granted by the Army to Studebaker, another contractor engaged in manufacturing a similar vehicle. The Navy countered with the proposal, used by it generally in termination negotiations, of 3 percent on materials and purchased parts, and 10 percent on work in process. Plaintiff estimated that the proportion of inventories, consisting of work in process would be at least 25 percent. This estimate was based upon plaintiff’s historical experience. Assuming that 25 percent of plaintiff’s inventories consisted of work in process, the application of a 3 percent rate on raw materials and purchased parts, and a 10 percent rate on work in process would have yielded an overall rate of 4.750 percent. Plaintiff contended that its work in process on the pertinent contracts somewhat exceeded 25 percent. After discussion a profit rate of 4.875 percent emerged, and it was orally agreed by the conferees that plaintiff would submit its termination claims on that basis.
15. After the pretermination conferences, the Bureau of Ships, by letter dated July 19, 1945, submitted to plaintiff a draft of a pretermination agreement labeled “Draft of July 16, 1945” which referred to five of plaintiff’s principal war contracts, NObs. 1666, 2017, 2018, 2155 and 1394. Included in this draft as paragraph 4(d) was the following:
Profit: Profit will be paid by the Government to the contractor at the rate of 4.875% of the Contractor’s own costs with respect to the terminated portion of the contract. The base on which this rate of profit is computed shall include any expenses in connection with the packing of component parts for which the Contractor has not been compensated under Article 2(b) and 2(c) hereof, but shall not include the items specified in subparagraph (e) hereof, nor shall it include the amount of any subcontractors’ termination charges.
The draft contained extensive provisions concerning taking of inventories of fabricated or unfabricated parts, work in process, complete articles, components, supplies and other materials, as well as proposed agreements concerning classification of items of and disposal of termination inventory, an article unilaterally proposed by plaintiff (not acted upon by *675 the contracting officer) concerning the pricing and disposition of scrap materials, and various proposed agreements concerning the computation of the plaintiff’s claims.
The defendant’s letter of transmittal of the draft of the proposed pretermination agreement stated that the submitted draft was the outgrowth of an earlier draft proposed by the plaintiff, and that the defendant’s draft did not purport to be in final form and was not binding on either the Government or the plaintiff.
16. Plaintiff made no formal reply to the Navy letter of July 19,1945. While the draft of the proposed pretermination agreement was being circulated among plaintiff’s personnel for comments and suggestions, the war came to an end and the contracts in question were terminated. The proposed pretermination agreement was never executed.
17. On August 18, 1945, plaintiff’s Controller circulated an inter-office directive that termination was to proceed under the Joint Termination Regulation and not under the proposed pretermination agreement. He advised that the proposed agreement was never executed and was of no significance. Plaintiff’s post-termination activities with respect to its terminated war contracts did proceed under the Joint Termination Regulation.
18. When the termination notices issued by the Navy Department were received by plaintiff, work was stopped, suppliers and subcontractors were notified to stop work, and preparations were begun for inventory counts. The termination notices, however, did not stop all production since vehicles which had progressed through the paint shop were to be completed. The work in process inventories which were then on the feed lines of subcontractors and subassem-bly lines of plaintiff’s largest assembly plants were immediately reviewed with representatives of the Navy Department, and the disposition of such matter in some cases was ascertained right at that point. The subassemblies which were not used as such in the spare parts supplied under plaintiff’s contracts were disassembled, and the component parts returned to the stock bin of similar parts. The semi-fabricated pieces were scrapped. Materials in process were returned to stock bins.
*676 19. After various materials and parts had been returned to the stock bins, the customary preparation for inventory counting was undertaken, files straightened, and the material properly identified for the count. The return of materials and parts to the stock bins had been made with the knowledge and approval of the Navy Department. Under the circumstances existing at the time plaintiff’s inventory was taken, it was not possible to segregate between purchased parts and raw materials and work in process with respect to the terminated contracts.
20. The portions of the terminated war contracts which had been performed and billed to the Navy Department prior to August 17, 1945, and the balances remaining unperformed on September 30, 1945, were as follows:

21. On August 29, 1945, plaintiff requested permission to file one joint inventory schedule and settlement proposal covering contracts NObs. 1666, 2017, 1394 (Supplemental), and 2011, and one joint inventory schedule and settlement proposal covering contracts NObs. 2018, 2166 and 2155. At this same time plaintiff requested that it be relieved of the obligation of allocating between prime contracts the claims of its subcontractors. The basis of plaintiff’s request was that “the contractor’s inventory and accounting figures do not reflect either items or costs separately for these NObs. contracts, and any accurate allocation among such contracts could not be accomplished without unreasonable delay or effort.”
22. By letter dated September 21, 1945, Captain Bosen-stein approved plaintiff’s request to file two settlement claims *677 and two inventory schedules and to allocate its consolidated inventories to the individual contracts on a percentage basis. In the same letter Captain Eosenstein confirmed the understanding reached with plaintiff’s president, Mr. Davies, on September 18, 1945, this meeting being the reference (c) mentioned in the quoted part of the letter below, that the profit rate of 4.875 percent which had been agreed upon for purposes of reaching a pretermination agreement remained mutually agreeable, and would be claimed by plaintiff and be allowed by him when the termination claims were filed. The language appearing in such letter with regard to the profit rate is as follows:
It will be recalled that during negotiations with the Contractor looking toward a pre-termination agreement, a profit figure was agreed upon between the Contractor and the Contracting Officer of 4.875%, which figure would have been incorporated in the agreement had it been consummated. During the course of reference (c), the Contracting Officer on behalf of the Bureau of Ships, and Mr. Davies on behalf of the Contractor, agreed that this profit figure of 4.875%, which had previously been agreed upon for purposes ox the pre-termination agreement, was mutually agreeable and would be claimed and allowed in the termination claims submitted by the Contractor under the subject contracts.
23. It was understood by and between the conferees for the parties at the pretermination conference, and by and between Mr. Davies and Captain Eosenstein at the meeting on September 18, 1945, that the 4.875 percent rate of profit would be subject to review by the defendant’s Settlement Eeview Board in Washington. Negotiation was the only method of settlement used in settling plaintiff’s termination claims, and all parties understood that written agreements would have to be reached.
24. On November 2,1945, plaintiff requested permission to allocate subcontract charges among the various contracts on the basis of the relative canceled face value of each contract.
25. With respect to contracts NObs. 1394 (Supplemental) and NObs. 2017, two terminations were involved, one dated July 20,1945, for both contracts; one dated August 13,1945, for NObs. 1394 (Supplemental); and one dated August 30, 1945, for NObs. 2017. On November 12, 1945, plaintiff re *678 quested permission to consolidate its claims on both terminations and to set August 17,1945, as the consolidated termination date. The Navy had contended that the consolidated termination date should be August 30, 1945, and plaintiff was requested to submit reasons justifying the earlier date.
26. Difficulties arose in processing and apportioning plaintiff’s inventories on the basis of two joint claims covering certain contracts and individual claims covering other contracts. On November 15,1945, plaintiff requested permission to file one settlement proposal based upon combined inventories for all its terminated war contracts and to apportion charges among all the contracts according to the percentage ratio of the terminated portions of each contract.
27. On or about November 26,1945, plaintiff received verbal authorization from Captain Eosenstein to submit a single consolidated claim covering all its terminated war contracts, to treat August 17,1945, as the consolidated termination date, and to allocate charges among the terminated contracts on the basis of the relative canceled face value of each. This verbal authorization was confirmed by the Supervisor of Shipbuilding in a letter dated December 7, 1945.
28. After it had been advised by Captain Eosenstein that submission of one overall claim and use of August 17, 1945, as the consolidated date of termination would be acceptable to him, plaintiff filed with the Navy Department its first settlement proposal on November 27, 1945.
29. The termination claim as filed by plaintiff on November 27,1945, set forth a total inventory of metals, purchased parts, finished components and work in process of $18,618,-592.43. To this figure plaintiff applied the 4.875 percent profit rate to arrive at its claimed profit of $907,656.38.
30. When the physical count of plaintiff’s inventories was taken it was not made under conditions as they existed at the effective date of termination as detailed in findings 18 and 19. Many assemblies were disassembled at the request of the Navy for use as spares. The amount of material so classified as material and purchased parts rather than work in process is impossible of estimation. Boxing of spare parts, which had been or were in process of being boxed for export, was completed before the inventory count was taken. *679 These were classified as material rather than work in process.
31. After plaintiff had presented its first settlement proposal, questions arose concerning the treatment of various items included therein. These matters were taken up with Commander Hezlep, the Supervisor of Shipbuilding, in Los Angeles. Differences which could not be resolved with Commander Hezlep were taken up with Captain Eosenstein in Washington and resolved with him. It was understood that such resolution was subject to review by the Settlement Ee-view Board in Washington and that the settlement terms were to be embodied in a written agreement signed by the parties.
32. Plaintiff’s claim was received by the Contract Termination Section of the Navy Department, Bureau of Ships, Washington, D.C., on or about January 3, 1946. Accompanying such claim was a report dated December 14, 1945, by the Supervisor of Shipbuilding charged with the responsibility for plaintiff’s contracts. This report stated that the inventory schedules of the contractor had been examined by such office or other authorized Navy Department personnel; that based upon such examination the Supervisor of Shipbuilding was of the opinion that the inventories were in good physical condition and included no rejects or spoilage; that the inventories had been spotchecked for allocability; that based on such examination, all of the inventories were allocable to the canceled portions of plaintiff’s terminated contracts; and that prices had been checked and that the amounts of raw material and purchased parts listed on such inventories were considered reasonable. The report also noted the fact that the profit requested was based on the amount agreed to by Captain Eosenstein and Mr. Davies at the meeting of September 18,1945, and that the purchased parts shown in the claim as filed formed a larger percentage of the total inventories than would have been anticipated at the time of the profit negotiations. The report further called attention to questionable items contained in plaintiff’s claim, such as the failure to deduct from cost the amount of cash discounts, for which no adjustment had been required because of plaintiff’s waiver of other items of cost which might properly have been claimed.
*680 33. Plaintiff had not deducted cash discounts from the inventory prices listed in its claim. Instead of minutely examining each item and requiring the deduction of the discount taken with respect to it, the Supervisor estimated the total amount at no more than $360,000 and no adjustment was required because of plaintiff’s agreement to waive the items of cost listed in finding 40, which items plaintiff might legitimately have claimed. An inspection of plaintiff’s inventories by the Supervisory Cost Inspector disclosed net overstatements of approximately $7,000. No adjustment was required because of plaintiff’s waiver of the same potentially allowable items of cost.
34. On January 8, 1946, Captain Rosenstein, the assigned contracting officer, Commander Gordon Rule, the head of the Bureau’s Vessel Termination Section, and Lieutenant Bassett met with representatives of the plaintiff, Paul A. Davies, President, and B. C. Carter, Controller, and discussed plaintiff’s settlement proposal.
35. At this meeting the reasonableness of the 4.875 percent rate of profit claimed by plaintiff was questioned because it had been predicated on an estimate that at least 25 percent of plaintiff’s inventories consisted of work in process, whereas plaintiff’s settlement proposal showed work in process of only approximately 7 percent. Captain Rosenstein requested plaintiff to supply him information to justify the reasonableness of an allowance of profit at the 4.875 percent rate. Plaintiff complied by letter dated February 13, 1946.
36. Plaintiff was also requested to file an application for a partial payment. Because of the difference in interest plaintiff expected to receive on its termination claims, as opposed to the interest it was required to pay on loans obtained with Government guarantee (VT Loans), plaintiff refused the Navy’s request that it apply for partial payment.
37. Captain Rosenstein and the other Navy personnel concerned with plaintiff’s termination claims at that time determined that they would recommend to the Settlement Review Board that a partial payment in the amount of $18,500,000 be made to plaintiff. Accordingly, they prepared a memorandum to be submitted to the Settlement Review Board and *681 the Chief of the Bureau of Ships for approval of such partial settlement. In such memorandum it was stated:
The claim has been negotiated with the Contractor and it is the opinion of the Contracting Officer that not less than the total amount of this claim is owing and will be paid to the Contractor.
This recommendation was approved by the Settlement Review Board and the Chief of the Bureau of Ships and a check for $18,500,000 was tendered to and accepted by the plaintiff’s president, Mr. Davies, when he returned to Captain Rosen-stein’s office on January 10, 1946. The $18,500,000 allowed at that time represented approximately 95 percent of plaintiff’s total claim of $19,526,248.81. It was $118,592.43 less than the amount claimed in respect of inventories and did not represent any allowance for profit or disposal credits.
38. By letter dated February 13, 1946, plaintiff justified the profit rate by advising that it had listed in its settlement proposal as work in process only items which were unquestionably that. Also, because of the impossibility of segregating and identifying work in process, and because such identification had no consequence in view of plaintiff’s claim for an overall rate of profit, much work was not classified as work in process although it was legitimately that. Reduction in 1945 of lead time from about 200 vehicles to 60 vehicles is estimated to have reduced expected work in process by approximately $1,325,000.
39. Plaintiff further justified the reasonableness of the negotiated rate of 4.875 percent, not by attempting to apply the separate rates of paragraph (d) of the Uniform Termination Article to separate classes of plaintiff’s inventories, but rather by the waiver of unrelated legitimate costs and the showing of additional items which were legitimately work in process but which were not so classified.
40. Plaintiff agreed to waive the following items of cost:
(a) $280,000 freight on termination inventories.
(b) $400,000 cost of boxing Riverside inventories for shipment as spare parts.
(c) $144,000 burden on work in process.
(d) $350,000 general and administrative expenses incurred prior to termination.
*682 (e) $200,000 settlement expenses incurred prior to October 1,1945.
(f) $4,000,000 billings on approved change orders.
41. After receipt of plaintiff’s letter concerning reasons why the 4.875 percent rate should be allowed, Captain Rosen-stein on March 26, 1946, submitted his written proposals for settlement of plaintiff’s claim to the Settlement Review Board. With one exception, he recommended approval of plaintiff’s claim as it was submitted on November 27, 1945, including allowance of profit at the rate of 4.875 percent. The exception concerned freight charges in the sum of $21,222. A dispute had arisen concerning certain freight charges claimed by plaintiff as a part of its inventory costs, and plaintiff, after negotiation, agreed to decrease its claim for metals inventory by the amount of $21,222, and the Settlement Review Board was so advised.
42. On March 27, 1946, after considering the evidence before it and discussion of the various items of the claim, the Settlement Review Board certified its approval of the proposed settlement agreement as it was contained in plaintiff’s claim and the report and recommendation of the contracting officer. This constituted a partial settlement of the matters involved in the termination of the contracts, and was recognized by the Board as such. The action of the Board was approved by the Chief of the Bureau of Ships.
43. By letter dated April 11, 1946, the Navy submitted to plaintiff for execution two supplemental agreements covering the plaintiff’s termination claim as approved by the Settlement Review Board and the Chief of the Bureau of Ships.
44. At no time were negotiations conducted on the basis of plaintiff’s being entitled to a minimum amount of profit computed under the formula set forth in paragraph (d) of the Uniform Termination Article contained in some of the terminated contracts.
45. On May 21, 1946, plaintiff returned to the defendant executed copies of the supplemental contracts supplied by the Navy Department, as stated in finding 41. On or about June 6, 1946, plaintiff received one copy of each of these supplemental contracts which had been executed on behalf of the Navy Department. Payments of the amounts set forth in *683 the supplemental contracts (the amounts due after deduction of the partial payment of $18,500,000) were received by plaintiff as follows: June 12,1946, $817,670.52, and June 13,1946, $62,747.95, representing the principal sum payable, $876,-669.97, together with interest from the date of said agreements, March 27,1946, to the date of payment, in the amount of $3,748.50.
46. Between November 27, 1945, and October 22, 1946, plaintiff submitted 11 additional settlement proposals to the Navy Department.
47. On September 9, 1946, plaintiff submitted its 10th interim settlement proposal and claimed therein for the first time its settlement expenses incurred after October 1, 1945, in the aggregate amount of $590,077.65 accrued on plaintiff’s books as having been incurred in the following tax periods:

48.Under a general authorization made applicable to plaintiff on May 21, 1945, plaintiff was authorized to make final settlements of its subcontractors’ termination claims amounting to less than $10,000. On December 19, 1945, the Navy Department authorized disbursal to plaintiff of a fund of $15,000,000 as an advance for the purpose of permitting plaintiff to make payments to its subcontractors on account of their claims against plaintiff arising out of the termination by plaintiff of subcontracts pertaining to the contracts listed in finding 3. On January 3, 1946, plaintiff received the $15,000,000 restricted fund for use in settling claims under the provisions of the Contract Settlement Act of 1944. All of the settlements with subcontractors made by plaintiff on the claims were covered by Settlement Proposal No. 12. Plaintiff was not allowed interest on disbursements from this fund, but was allowed interest on its own corporate funds used in settlements of subcontractors’ claims.
*684 49. Plaintiff’s 12th and final settlement proposal was submitted to the Navy Department on October 22, 1946, and the final disposition of plaintiff’s claims in connection with the termination of its war contracts, including its settlements with subcontractors, was made on the basis thereof. The profit allowance of $906,621.81, previously allowed in the first claim and included in the proposal for final disposition, was 4.875 percent of $18,597,370.43, which sum was the total amount of plaintiff’s previously allowed inventory of metals, purchased parts, finished components, and work in process.
This final settlement proposal provided for an allowance for settlement expenses (including general and administrative among others) of $590,077.65 and an allowance for interest of $160,745.10. The amount of $590,077.65 represented total expenses of $610,130.53 allocable to plaintiff’s terminated war contracts for the period October 1, 1945, to September 30, 1946, inclusive, less expenses in the amount of $20,052.88 absorbed by plaintiff. The amount of $160,745.10 represented interest at the rate of 2% percent on the principal amount of $19,220,150.37 for the period commencing 30 days after the effective date of termination of plaintiff’s aforesaid war contracts to January 10,1946, inclusive, plus interest at the rate of 2*4 percent on $720,150.37 for the period January 11,1946, to June 11,1946, inclusive, plus the amount of $477 representing interest charged against the Navy Department by plaintiff on account of the use of plaintiff’s funds in settlement of subcontractors’ claims in connection with its terminated war contracts. The principal amount of $19,-220,150.37 was computed per plaintiff’s 12th settlement proposal as follows:
Metals_ $1,321,027.72
Purchased Parts- 15,410, 599. 86
finished Components- 711,094.32
Work in Process- 1,154, 648.53
18, 597,370.43
Add: Profit Allowance- 906,621.81
Total_ 19,503,992.24
Deduct: Disposal credits- 283,841.87
Balance 19,220,150.37
*685 The amount of $720,150.37 was computed as follows:
Amount due plaintiff per 12th settlement proposal- $19,220,150.37
Payment on account Jan. 10,1946_ 18,600, 000.00
Balance_ 720,150.37
50. Bear Admiral F. J. Wille, Contracting Officer of the Bureau of Ships, recommended approval by the Settlement Review Board of plaintiff’s 12th and final settlement proposal in a memorandum dated November 19,1946. The Settlement Review Board approved the final settlement of plaintiff’s claim on November 26, 1946. Final settlement was also approved by the Chief of the Bureau of Ships.
51. On December 12, 1946, the Navy Department transmitted to plaintiff two proposed settlement agreements, in the form of second supplemental contracts, proposing a final settlement of plaintiff’s claims arising out of the termination of the war contracts listed in finding 3. On December 19,1946, plaintiff returned executed copies of the second supplemental contracts to the Navy Department. On January 3,1947, plaintiff received one copy of each of the second supplemental contracts which had been executed on behalf of the Navy Department. Plaintiff received its final payment for additional interest allowed by the Navy Department on January 3,1947. On January 9,1947, plaintiff received the TJ.S. Treasury Department’s check dated January 3, 1947, in settlement of the balance due on its termination claims, in the amount of $604,674.57, computed as follows:
Settlement expenses_$462,577.65
General and administrative expenses_ 127,500.00
590,077.65
Interest- 14,477.00
Total- 604,554.65
Interest-- 119.92
Total- 604, 674.57
52.Prior to the payments to the plaintiff set forth in finding 51, plaintiff received payments on account of the termination of its war contracts listed in finding 3, in the amounts and on the items as follows:
*686 Termination inventories-$18, 597,370. 43
Profit allowance- 906, 621. 81
Total interest allowance- 160, 745.10
Aggregate amount due- 19, 664, 737.34
Payments received by plaintiff:
Jan. 10, 1946_$18,500,000.00
June 12, 1946_ 817, 670. 52
June 13, 1946_ 62, 747. 95
Additional interest received by plaintiff on
Jan. 3, 1947_ 477. 00
Disposal credits_ 283, 841. 87
Total_ 19, 664, 737. 34
53. During negotiations, an attorney for the Navy suggested that, for Federal income and excess profits tax purposes, the profit allowance with respect to plaintiff’s terminated war contracts might be accruable in 1946 rather than in the tax year ended September 30, 1945. However, because of the position taken by the Commissioner of Internal Eevenue in Mimeograph No. 5897, C.B. 1945, 131, plaintiff decided to include the profit allowance in its 1945 income and file a claim for refund.
54. In its corporate income and declared value excess profits tax return for the tax year ended September 30, 1945, plaintiff reported ordinary net income, prior to adjustment on account of excess profits net income and dividends received credit, in the amount of $20,662,580.87, and in its excess profits tax return for the pertinent tax year plaintiff reported excess profits net income in the amount of $20,548,-532.04, and adjusted excess profits net income in the amount of $18,897,662.07, after application of the specific exemption of $10,000 and the excess profits credit (based on income) of $1,640,869.97.
55. Included in the computation of plaintiff’s normal tax net income, surtax net income and excess profits net income reported for the tax year ended September 30,1945, was the amount of $907,656.38, which amount plaintiff included in its gross income for the pertinent tax year on account of its claims against the defendant by reason of the latter’s termination of plaintiff’s contracts referred to in finding 3.
*687 56.In its excess profits tax return for the tax year ended September 30, 1945, plaintiff computed and disclosed its excess profits tax liability for such tax year in the amount of $14,194,588.68, and its income tax liability for such year in the total amount of $667,783.17. Plaintiff paid to the Collector the amount of its income tax and excess profits tax liabilities as disclosed by its returns as follows:

Plaintiff did not incur any liability on account of declared value excess profits tax for the tax year ended September 30, 1945.
57. On December 29, 1945, the Commissioner of Internal Revenue granted plaintiff permission to change its accounting year for tax purposes from a tax year ending September 30 to a calendar year ending December 31. Plaintiff filed with the Collector its corporate income and excess profits tax returns for the short tax period October 1,1945, to December 31, 1945, and has subsequently prepared and filed its corporate tax returns on the calendar year basis.
58. The Commissioner of Internal Revenue, upon audit and review of plaintiff’s income and excess profits tax returns for the tax year ended September 30,1945, determined an overassessment in plaintiff’s income tax liability for that tax year in the amount of $347.15 and determined a deficiency in plaintiff’s excess profits tax liability for that year in the amount of $267,107.79. The asserted deficiency in plaintiff’s excess profits tax for that year was assessed and was satisfied by plaintiff, together with interest thereon, as follows:

*688 59. The amount of $124,542.08 (additional excess profits tax), paid by plaintiff to the Collector on August 21, 1947, together with interest thereon in the amount of $12,577.04, was occasioned by certain uncontested adjustments made by the Commissioner of Internal Revenue to plaintiff’s taxable income for the tax year ended September 30,1945. On June 11, 1948, the balance of the asserted deficiency for the tax year ended September 30, 1945, was satisfied by credit in the amount of $142,565.71, together with interest thereon of $21,304.78, from an overassessment of plaintiff’s excess profits tax liability for the tax year ended September 30, 1944, determined and allowed by the Commissioner of Internal Revenue in the total amount of $556,309.72, exclusive of interest thereon.
60. In making the above-mentioned adjustments to plaintiff’s corporate income tax and excess profits tax liabilities for the tax year ended September 30,1945, the Commissioner of Internal Revenue determined that the adjusted net income of plaintiff was in the amount of $22,014,426.27; that its normal tax and surtax net income was in the amount of $1,672,941.41, resulting in a determined corporate income tax liability of $667,436.02; and that plaintiff’s adjusted excess profits net income' for that tax year was $20,250,669.65, resulting in a determined excess profits tax liability of $15,161,004.34.
61. On May 1,1947, plaintiff paid to the Collector on account of its excess profits tax liability for the tax year ended September 30,1945, the amount of $699,307.87, together with interest for the period to May 2,1947, in the amount of $57,-898.86. Having reported and paid original excess profits tax liability for the tax year ended September 30, 1945, of $14,194,588.68, plaintiff thus had had assessed against it and had paid, total excess profits tax for the pertinent tax year of $14,893,896.55, plus the excess profits tax assessment of $267,-107.79 assessed and satisfied as shown in finding 58, or a total excess profits tax liability determined for the tax year ended September 30, 1945, of $15,161,004.34.
62. Plaintiff’s overassessment of income tax for the tax year ended September 30, 1945, was credited to plaintiff’s *689 account, and the deficiencies in excess profits tax liability as determined for the same year were paid or satisfied as shown hereinabove. In his determination of plaintiff’s income tax and excess profits tax liabilities for the tax year ended September 30, 1945, the Commissioner of Internal Eevenue included in plaintiff’s income the amount of $906,621.81 on account of its claims arising out of the termination of its war contracts listed in finding 3, rather than the $907,656.38 reported by plaintiff in filing its return for such year. This reduction in income was made to reflect the elimination of the $21,222 of freight charges from plaintiff’s termination inventory, as related in finding 39, the application of the profit rate of 4.875 percent being made to the total sum of the inventory as reduced to that extent.
63. On November 9,1950, plaintiff filed with the Collector a claim for refund of income and excess profits taxes exacted for the tax year ended September 30,1945, in the amount of $652,767.67, plus statutory interest thereon.
64. In accordance with the provisions of Section 3772 of the Internal Revenue Code of 1939, the Commissioner of Internal Revenue notified plaintiff of the disallowance of its claim for refund for the tax year ended September 30,1945, on April 24,1952. The basis of the Commissioner’s rejection was his determination that the amount of $906,621.81 was in-cludible in plaintiff’s income for the tax year ended September 30,1945. No part of any sum representing the instant claim which was collected from plaintiff as aforesaid by the Collector has been refunded, repaid or credited to plaintiff.
65. Plaintiff’s petition was timely filed in this Court on April 8, 1954. The grounds upon which this case was presented and tried are the same as those stated in the claim for refund.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed.